UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.:  15-30382 (AMN) |
| NANCY L. NEWMAN, | : | Chapter 7 |
| *Debtor* | : | |
| | : | |
| | : | |
| HERITAGE EQUITIES, LLC | : | Adv. Pro. No. 15-3019 (AMN) |
| D/B/A COMMISSION EXPRESS | : | |
| OF CENTRAL CONNECTICUT, | : | |
| *Plaintiff* | : | |
| v. | : | |
| NANCY L. NEWMAN | : | |
| *Defendant* | : | |
| | : | |

## MEMORANDUM OF DECISION AFTER TRIAL

| | |
|---|---|
| Heritage Equities, LLC d/b/a Commission Express of Central Connecticut *Plaintiff* | Houston Putnam Lowry, Esq. Polivy, Tachner, Lowry & Clayton LLC 6 Central Row-Second Floor PO Box 23-0294 Hartford, CT 06123 |
| Nancy L. Newman *Defendant* | Julie A. Morgan, Esq. JA Morgan Law, LLC 16 Spring Lane Farmington, CT 06032 |
| | Bonnie C. Mangan, Esq. The Law Office of Bonnie C. Mangan, P.C. 1050 Sullivan Avenue, Suite A3 South Windsor, CT 06074 |

1

## I.    **INTRODUCTION**

Plaintiff, Heritage Equities, LLC, doing business as Commission Express of Central Connecticut ("Heritage"), commenced this adversary proceeding against the defendant and debtor, Nancy L. Newman ("Newman"), seeking a determination that a debt owed by Newman to Heritage is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and/or 523(a)(6).[1]

Though the parties dispute the precise nature and extent of the transactions, it is undisputed that Heritage and Newman engaged in a financial relationship whereby Newman, a real estate agent, purportedly transferred her interest in expected sales commissions to Heritage, and in consideration for these transfers, Heritage purportedly provided Newman with cash advances on such commissions.  Heritage filed this adversary proceeding in Newman's underlying Chapter 7 case, *In re Nancy L. Newman*, Docket No. 15-30382 (the "Main Case"), asserting its claim, arising from six specific real estate transactions, was non-dischargeable because Newman committed various frauds in the course of those transactions.  Newman denied the allegations of fraud, advanced various defenses, and filed a counterclaim alleging violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, *et seq.* ("CUTPA").

Having considered the pleadings, testimony, evidence admitted during trial, the court's own docket and arguments of the parties, the court finds Heritage did not meet its burden of proof to establish its claims are not dischargeable pursuant to

---

[1]   Unless otherwise noted, all statutory citations refer to the Bankruptcy Code, Title 11, United States Code.

§§ 523(a)(2)(A), 523(a)(4), or 523(a)(6), and therefore any debt owed by Newman is

dischargeable.  As to Newman's counterclaim against Heritage, the court finds Newman

failed to meet her burden of proof to establish a violation of CUTPA.

## II.    JURISDICTION, VENUE, AND STANDING

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§ 1334(b) and 28 U.S.C. § 157(b), and the United States District Court for the District of

Connecticut's General Order of Reference dated September 21, 1984.  This adversary

proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) ("allowance of

disallowance of claims"); 157(b)(2)(I) ("determinations as to the dischargeability of

particular debts") and 157(b)(2)(O) ("other proceedings affecting the liquidation of the

assets of the estate or the adjustment of the debtor-creditor or the equity security holder

relationship").  This adversary proceeding arises under the Main Case pending in this

District; therefore, venue in this District is proper pursuant to 28 U.S.C. § 1409.

Heritage has standing to seek the relief sought because it is a creditor pursuant to

§ 101(10).  The parties each consented to this court entering a final order, on both the

non-dischargeability claim and the CUTPA claim, subject to traditional rights to appeal.

AP-ECP No. 94, 00:16:00 – 00:18:00; [2]  *see*, Fed.R.Bank.P. 7008, 7012(b) (amended

April 28, 2016, effective December 1, 2016).

## III.    PROCEDURAL HISTORY

Newman filed a voluntary Chapter 7 bankruptcy petition on March 16, 2015 (the

"Petition Date"), listing a disputed claim owed to Heritage in the amount of $58,000.00,

---

[2]    References to the docket of the Main Case appear in the following form: "ECF No. __." References to
the docket of this adversary proceeding appear in the following form: "AP-ECP No. __."  References to
testimony refer to the respective audio file entered on the docket and include the beginning and ending
times of the relevant witness' testimony in the following format:  hours:minutes:seconds.

of which $27,491.00 was alleged to be secured.  ECF No. 1.  Heritage filed a proof of

claim in the Main Case, number 2-1 ("POC 2-1"), on March 31, 2015, in the amount of

$178,065.87, of which $178,064.87 was alleged to be secured, and $1.00 was

unsecured.[3]  On June 19, 2015, Heritage filed the present adversary proceeding,

asserting its claim is non-dischargeable pursuant to §§ 523(a)(2),  523(a)(4), and

523(a)(6).  AP-ECF No. 1.

    Common to all counts, the complaint alleged:

1. Newman signed a Master Security Agreement with Heritage that acknowledged,
   "each transaction represented by this Agreement is not a consumer transaction
   but the sale of a business account receivable at a purchase price discount."  AP-
   ECF No. 1, ¶ 8.

2. Newman signed a Business Purpose Checklist with Heritage that acknowledged
   Heritage, "does not make loans and does not provide consumer financing."  AP-
   ECF No. 1, ¶ 9.

3. Heritage filed a UCC-1 Financing statement with the Connecticut Secretary of
   State.  AP-ECF No. 1, ¶ 12.

4. Newman, "intended to steal the proceeds of commissions" from Heritage and
   "owes [Heritage] treble damages pursuant to Conn. Gen. Stat. §52-564."  AP-
   ECF No. 1, ¶ 15.

5. Newman's debts to Heritage are therefore non-dischargeable pursuant to
   §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).  AP-ECF No. 1, ¶ 7.

    The complaint generally alleged it was brought pursuant to §§ 523(a)(2)(A),

523(a)(4) and 523(a)(6) but each count referenced a single property transaction and

alleged a violation of the Connecticut larceny statute, Conn. Gen. Stat. § 52-564.

*Compare*, ECF No. 1, ¶ 7 with ¶¶ 23 (page 4), 20 (page 4), 27 (page 6), 20 (page 6), 20

---

[3]  According to Newman's counsel during a December 6, 2016 hearing in this matter, Barbara Katz, the
Chapter 7 Trustee in the Main Case, has not yet determined whether there are any assets in the estate,
and therefore has not yet decided whether to file objections to claims.  AP-ECF No. 104, 00:01:56 –
00:02:25.

(page 7), and 20 (page 8).  The counts in the complaint relate to six different property

transactions, as follows:

| Count | Property |
|-------|----------|
| 1 | 11 Lake Drive, Moodus, Connecticut |
| 2 | 1053 Middle Turnpike, Manchester, Connecticut |
| 3 | 213 Alling Street, Berlin, Connecticut |
| 4 | 37 Sunridge Lane, Cromwell, Connecticut |
| 5 | 12 Clubhouse Drive, Cromwell, Connecticut |
| 6 | 19 Lake Drive, East Haddam, Connecticut |

Newman answered the complaint by generally denying the allegations, and

asserting affirmative defenses including: payment; that Heritage failed to mitigate its

damages; that Heritage's claims were barred by unclean hands; that the contracts were

void pursuant to Connecticut and federal law; and, that the interest rate in the contracts

was usurious.[4]  AP-ECF No. 28.  Newman also alleged a counterclaim against Heritage,

asserting the transactions between the parties were loans, the interest rates on those

loans were usurious, Heritage lacked the requisite licenses for lending pursuant to

Connecticut law, and Heritage's actions constituted unfair and deceptive business

practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat.

§ 42-110a. AP-ECF No. 28.

The matter was tried before the court on December 5, 2016, and December 6,

2016.  AP-ECF Nos. 94, 95, 101, 102, 103, 104.  Thereafter, the parties filed proposed

findings of fact and conclusions of law, filed post-trial briefs and engaged in post-trial

oral argument.  AP-ECF Nos. 109, 110, 111, 112, 113, 114, 117.

---

[4]    The counterclaim regarding usurious interest was abandoned in the post-trial briefing by
Newman.

## IV.    **FINDINGS OF FACT**

In accordance with Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052, after

consideration of the trial testimony and argument, the documents admitted into

evidence, and examination of the official record of the Main Case and the instant

adversary proceeding, the court finds the following facts.

1. Nancy Newman, the Debtor, worked as a real estate agent licensed in the State
   of Connecticut for approximately thirty (30) years.  *Testimony of Newman*, AP-
   ECF No. 102, 00:11:30 – 00:12:00.

2. In 2012, the time period relevant to the instant case, Newman was affiliated with
   RE/Max Marketplace in Cromwell, Connecticut.  *Testimony of Newman*, AP-ECF
   No. 102, 00:12:30 – 00:12:40.

3. Newman was paid by commission, based on a percentage of the sale price of
   each home she sold, but was entitled to a commission only if the sale transaction
   closed.  *Testimony of Newman*, AP-ECF No. 102, 00:12:50 – 00:13:10.

4. Bruce Moore ("Moore") was a member of plaintiff Heritage Equities, LLC.
   *Testimony of Moore*, AP-ECF No. 94, 01:03:00 - 01:03:10.

5. Heritage was a franchisee of Commission Express National, and did business as
   Commission Express of Central Connecticut.  *Testimony of Moore*, AP-ECF No.
   94, 01:03:10 - 01:03:20; Pl. Ex. 101.

6. Heritage was not a licensed consumer loan lender in Connecticut.  AP-ECF No.
   37.

7. Richard Pentore, an attorney, represented the purchasers in the sale
   transactions of 1053 Middle Turnpike East, Manchester, Connecticut, and 6
   Helena Drive, Cromwell, Connecticut.  Pentore was responsible for issuing
   checks upon the closing of those sales.  *Testimony of Pentore*, AP-ECF No. 94,
   00:42:00 – 00:43:55.

8. Joseph Fazekas, was Newman's supervising broker, and co-owner of RE/Max
   Marketplace.  *Testimony of Fazekas*, AP-ECF No. 95, 00:01:30 – 00:03:00.

9. On February 2, 2012, Newman signed a "Master Security Agreement" with
   Heritage.  Pl. Ex. 102.  *Testimony of Newman*, AP-ECF No. 102, 00:19:10 –

00:19:45.  Moore signed the same agreement on behalf of Heritage.  Pl. Ex. 102.
*Testimony of Moore*, AP-ECF No. 94, 01:15:05 – 01:15:30.

10. On February 8, 2012, Newman signed a "Business Purpose Checklist and
Declaration," with Heritage, which described her as a sole proprietor and
independent contractor engaged in the real estate business.  Pl. Ex. 103.

11. On February 11, 2012, Heritage filed a UCC-1 Financing Statement with the
State of Connecticut Secretary of the State, asserting a security interest over all
of Newman's "current and future accounts receivable," including proceeds from
Newman's expected sales commissions.  Pl. Ex. 104.

12. As relevant here, Newman signed six agreements entitled Account Receivable
Sale and Assignment Agreement ("Sale and Assignment Agreement") with
Heritage.[5]  Pl. Ex. 112, 113, 114, 115, 116, 117.  With the exception of unique
language identifying the address of the property to be sold, and amounts to be
paid, each individual agreement contained identical operative language
summarized as follows:

    a. Each agreement listed the address of a property for which a sale was
    pending, and the settlement or closing date.

    b. Each agreement listed the amount of Newman's commission, the
    "receivable;" an "advance" to be paid to Newman on the execution of the
    agreement, equal to 80% of the commission;[6] and a "holdback," to be paid
    to Newman upon Heritage's receipt of the commission after the real estate
    transaction closed, equal to 10% of the commission.

13. The assumption underlying each Sale and Assignment Agreement was that
Heritage would retain 10% of the commission as a fee.  Newman would be paid
80%[7] in advance of each real estate closing and 10% after each closing, for a
total to be paid to Newman equal to 90% of the total commission.

14. According to section two of the Master Security Agreement, Pl. Ex. 102, after
each Sale and Assignment Agreement was executed, payment to Heritage was
due by the earliest of:
    a. Three days, in the event Newman "wrongfully receive[s] payment of any
    account receivable," or

---

[5]  Of the six Sale and Assignment Agreements, only Ex. 116 and Ex. 117 were signed by Moore for
Heritage; the remaining four, Ex. 112, Ex. 113, Ex. 114, and Ex. 115, were not signed by Heritage.
[6]  An exception is the Sale and Assignment Agreement for 213 Alling Street, where the "advance"
equaled approximately 52% of the commission.
[7]  *But see*, fn. 6.

     b.  Ten days of the settlement date as provided on the settlement statement for the property, or

     c.  Ten days in the event a settlement agent [was] changed without Heritage's prior knowledge and approval, or

     d.  Thirty days after the stated settlement date.

15. In the event Newman failed to pay within the time as described in section two of the Master Security Agreement, Newman would be in default, and interest would begin to accrue at the rate of 18% per year.  Pl. Ex. 102.

16. The repayment terms of the Master Security Agreement required Newman to repay the debt, regardless of whether the underlying transaction closed.  Pl. Ex. 102.  Thus, Newman, and not Heritage, bore the risk if the transaction failed to close.

17. Section three of the Master Security Agreement provided in the event of default, "[Newman] agrees that [Heritage] will retain the Holdback as shown in the Assignment Agreement as an additional fee (discount) and interest will accrue to [Heritage] on the amount owed to [Heritage] at the rate of 18% per annum until paid in full.  [Newman] further agrees to assign to [Heritage] additional accounts receivable to cure the Default."  Pl. Ex. 102.

18. Heritage did not submit an accounting of the amount of interest or fee charged on any outstanding balance, evidence substantiating the date it believed Newman to be in default, or any accounting of interest charged to Newman because of a default.

19. Newman also signed her name to six documents entitled "Notice of Assignment," corresponding to the six property transactions identified in the complaint.  Each Notice of Assignment purported to:

     a.  Inform RE/Max Marketplace, Newman's licensed real estate broker that supervised her work as a real estate agent, that Heritage was entitled to be paid sales commissions that she earned upon the closing of specific real estate transactions; and,

     b.  Direct RE/Max Marketplace to pay such commissions directly to Heritage.

20. Newman signed the name of Joseph Fazekas of RE/Max Marketplace, on each of the Notices of Assignment and testified that she was authorized to do so.  *Testimony of Newman*, AP-ECF No. 102, 00:10:00 – 01:11:15.

21. Joseph Fazekas testified that he did not authorize Newman to sign his name to the Notices of Assignment.  *Testimony of Fazekas*, AP-ECF No. 95, 00:10:30 – 00:11:00.

22. Elizabeth Scalise, who worked as a real estate broker at RE/Max Marketplace in 2012, testified that Joseph Fazekas authorized her to sign his name. *Testimony of Scalise*, AP-ECF No. 102, 00:06:30 – 00:07:00.

23. Patrick Severese, Newman's son who worked as a real estate broker at RE/Max Marketplace in 2012, testified that Joseph Fazekas authorized Newman to sign his name. *Testimony of Severese*, AP-ECF No. 102, 02:01:00 – 02:02:30.

24. Newman signed Sale and Assignment Agreements for each of the following properties:

| Count | Property | Pl. Exhibit |
|-------|----------|-------------|
| 1 | 11 Lake Drive, Moodus, Connecticut | 113 |
| 2 | 1053 Middle Turnpike East, Manchester, Connecticut | 114 |
| 3 | 213 Alling Street, Berlin, Connecticut | 112 |
| 4 | 37 Sunridge Lane, Cromwell, Connecticut | 115 |
| 5 | 12 Clubhouse Drive, Cromwell, Connecticut | 116 |
| 6 | 19 Lake Drive, East Haddam, Connecticut | 117 |

25. Relative to Count 1 of the complaint, on or about August 23, 2012, Newman signed a Sale and Assignment Agreement regarding 11 Lake Drive, Moodus, Connecticut (the "11 Lake Drive Agreement"). Pl. Ex. 113. The 11 Lake Drive Agreement provided for the following:

    a. A purported sale of a real estate commission by Newman to Heritage in the amount of $6,750.00.

    b. Immediate payment of $5,400.00 by Heritage to Newman.

    c. Future payment of $675.00 by Heritage to Newman upon Heritage's receipt of the real estate sales commission. Pl. Ex. 113.

26. Newman testified that despite the language in the 11 Lake Drive Agreement, Newman received only $5,008.00 from Heritage relating to the 11 Lake Drive property (not $5,400.00), for Newman's commission for the sale of 11 Lake Drive. *Testimony of Newman*, AP-ECF No. 102, 00:50:30 – 00:50:55.

27. Moore testified that Newman received an unspecified amount of "value" for the 11 Lake Drive Agreement. *Testimony of Moore*, AP-ECF No. 95, 02:17:00 – 02:17:15. When specifically asked by the court whether Heritage paid Newman according to the terms of the 11 Lake Drive Agreement, Moore stated he "would actually have to consult the accounting." *Testimony of Moore*, AP-ECF No. 101, 01:33:10 – 01:34:00. However, no accounting was submitted into evidence.

28. Newman testified that the sale of 11 Lake Drive failed to close. *Testimony of Newman*, AP-ECF No. 102, 01:43:50 – 01:44:00.

29. Newman testified that at the time she signed the 11 Lake Drive Agreement, she believed the transaction would eventually close, and that she would be entitled to a commission. *Testimony of Newman*, AP-ECF No. 102, 01:08:00 – 01:09:00.

30. Newman signed a Notice of Assignment for 11 Lake Drive, in which she represented she was entitled to a sales commission for the sale and that "this is the only assignment" of the commission. Pl. Ex. 130.

31. Relative to Count 2 of the complaint, on or about August 23, 2012, Newman signed a Sale and Assignment Agreement regarding 1053 Middle Turnpike East, Manchester, Connecticut (the "1053 Middle Turnpike Agreement"). Pl. Ex. 114. The 1053 Middle Turnpike Agreement provided for the following:

   a. A purported sale of a real estate commission by Newman to Heritage in the amount of $5,725.00
   b. Immediate payment of $4,800.00 by Heritage to Newman.
   c. Future payment of $572.50 by Heritage to Newman upon Heritage's receipt of the real estate sales commission. Pl. Ex. 114.

32. Newman testified that despite the terms of the 1053 Middle Turnpike Agreement, no money was paid by Heritage to Newman for Newman's commission for the sale of 1053 Middle Turnpike East. *Testimony of Newman*, AP-ECF No. 101, 01:31:34 - 01:32:30.

33. Heritage did not offer any evidence of the consideration paid or transferred by Heritage to Newman relating to the 1053 Middle Turnpike Agreement. Moore testified Newman received an unspecified amount of "value" for the 1053 Middle Turnpike East transaction. *Testimony of Moore*, AP-ECF No. 95, 02:18:50 – 02:19:00.

34. The sale of 1053 Middle Turnpike East closed, with Attorney Pentore acting as the settlement agent. *Testimony of Pentore*, AP-ECF No. 94, 00:27:30 – 00:27:45.

35. The HUD-1 Settlement Statement for the closing of 1053 Middle Turnpike East identified Heritage as the party to be paid Newman's sales commission. Pl. Ex. 108.

36. Newman instructed Attorney Pentore to issue the commission check for the sale of 1053 Middle Turnpike East to RE/Max Marketplace, instead of Heritage. *Testimony of Pentore*, AP-ECF No. 94, 00:38:40 – 00:39:40.

37. Moore, on behalf of Heritage, authorized Attorney Pentore to issue the commission check for the sale of 1053 Middle Turnpike East to RE/Max Marketplace, instead of Heritage. *Testimony of Pentore*, AP-ECF No. 94, 00:38:40 – 00:39:40.

38. RE/Max Marketplace received $5,725.00 as a real estate commission for the sale of 1053 Middle Turnpike East. Pl. Ex. 109.

39. Heritage did not receive any funds from the sale of 1053 Middle Turnpike East. *Testimony of Moore*, AP-ECF No. 94, 02:09:00 – 02:09:30.

40. Newman signed a Notice of Assignment for 1053 Middle Turnpike East, in which she represented she was entitled to a sales commission for the sale and that "this is the only assignment" of the commission. Pl. Ex. 132.

41. RE/Max Marketplace paid Newman: (1) an advance on the 1053 Middle Turnpike East commission of $1,000.00 on October 2, 2012; and, (2) $4,351.00 on November 6, 2012. Pl. Ex. 118, 120, 121.

42. Relative to Count 3 of the complaint, on or about September 20, 2012, Newman signed a Sale and Assignment Agreement regarding 213 Alling Street, Berlin, Connecticut (the "213 Alling Street Agreement"). Pl. Ex. 112. The 213 Alling Street Agreement provided for the following:

   a. A purported sale of a real estate commission by Newman to Heritage in the amount of $5,400.00.
   b. Immediate payment of $2,800.00 by Heritage to Newman.
   c. Future payment of $350.00 by Heritage to Newman upon Heritage's receipt of the real estate sales commission. Pl. Ex. 112.

43. Newman testified that despite the terms of the 213 Alling Street Agreement, no money was paid by Heritage to Newman on or about September 20, 2012, or thereafter, relating to the sale of 213 Alling Street. *Testimony of Newman*, AP-ECF No. 102, 00:49:20 – 00:49:50; AP-ECF No. 101, 00:54:25 – 00:54:35.

44. When specifically asked by Newman's counsel "how much money did Commission Express pay to Nancy Newman for 213 Alling Street," Moore replied "zero." *Testimony of Moore*, AP-ECF No. 101, 00:54:10 – 00:54:30.

11

45. Newman testified that the sale of 213 Alling Street failed to close. *Testimony of Newman*, AP-ECF No. 102, 01:51:30 – 01:51:40.

46. Newman signed a Notice of Assignment for 213 Alling Street, in which she represented she was entitled to a sales commission for the sale and that "this is the only assignment" of the commission. Pl. Ex. 129.

47. Relative to Count 4 of the complaint, on or about September 20, 2012, Newman signed a Sale and Assignment Agreement regarding 37 Sunridge Lane, Cromwell, Connecticut (the "37 Sunridge Lane Agreement"). Pl. Ex. 115. The 37 Sunridge Lane Agreement provided the following:

   a. A purported sale of a real estate commission by Newman to Heritage in the amount of $2,500.00.
   b. Immediate payment of $2,000.00 by Heritage to Newman.
   c. Future payment of $250.00 by Heritage to Newman upon Heritage's receipt of the real estate sales commission. Pl. Ex. 115.

48. Newman testified that despite the terms of the 37 Sunridge Lane Agreement, no money was paid by Heritage to Newman for Newman's commission for the sale of 37 Sunridge Lane. *Testimony of Newman*, AP-ECF No. 102, 01:15:25 – 01:15:35.

49. Heritage did not offer any evidence of the consideration paid or transferred by Heritage to Newman relating to the 37 Sunridge Lane Agreement. Moore testified Newman received an unspecified amount of "value" for the 37 Sunridge Lane transaction. *Testimony of Moore*, AP-ECF No. 95, 02:19:00 – 02:19:20.

50. Newman testified that the sale of 37 Sunridge Lane failed to close, because the purchaser of the property was turned down for a mortgage. *Testimony of Newman*, AP-ECF No. 102, 01:15:40 – 01:16:00.

51. Newman signed a Notice of Assignment for 37 Sunridge Lane, in which she represented she was entitled to a sales commission for the sale and that "this is the only assignment" of the commission. Pl. Ex. 131.

52. RE/MAX Marketplace paid Newman $5,861.20 on or about December 4, 2012, with a "Memo/Description" that it was for "37 Sunridge Lane, Cromwell & 141 Savage Hill[,] Berlin."[8] Pl. Ex. 118.

---

[8]   Neither Heritage nor Newman introduced any evidence regarding "141 Savage Hill[,] Berlin."

53. Relative to Count 5 of the complaint, on or about September 27, 2012, Newman
signed a Sale and Assignment Agreement regarding 12 Clubhouse Drive,
Cromwell, Connecticut (the "12 Clubhouse Drive Agreement"). Pl. Ex. 116. The
12 Clubhouse Drive Agreement provides the following:

    a. A purported sale of a real estate commission by Newman to Heritage in
the amount of $4,200.00.
    b. Immediate payment of $3,360.00 by Heritage to Newman.
    c. Future payment of $420.00 by Heritage to Newman upon Heritage's
receipt of the real estate sales commission. Pl. Ex. 116.

54. Newman testified that despite the terms of the 12 Clubhouse Drive Agreement,
she received only $2,000.00 from Heritage for Newman's sales commission for
the sale of 12 Clubhouse Drive. *Testimony of Newman*, AP-ECF No. 102,
00:51:20 – 00:52:15.

55. Heritage did not offer any evidence of the consideration paid or transferred by
Heritage to Newman relating to the 12 Clubhouse Drive Agreement. When
Newman's counsel asked Moore to clarify his testimony as to whether Newman
received $3,360.00 as described in the 12 Clubhouse Drive Agreement, Moore
responded only that Newman received "value of some sort" for the 12 Clubhouse
Drive transaction. *Testimony of Moore*, AP-ECF No. 94, 02:23:30 – 02:24:00.

56. The sale of 12 Clubhouse Drive closed. *Testimony of Fazekas*, AP-ECF No. 95,
00:04:50 – 00:05:00.

57. Newman signed a Notice of Assignment for 12 Clubhouse Drive, in which she
represented she was entitled to a sales commission for the sale and that "this is
the only assignment" of the commission. Pl. Ex. 127.

58. RE/Max Marketplace paid Newman $2,012.00 on or about November 6, 2012,
with a "Memo/Description" that it was for "12 Clubhouse Dr." Pl. Ex. 118.

59. Relative to Count 6 of the complaint, on or about October 11, 2012, Newman
signed a Sale and Assignment Agreement regarding 19 Lake Drive, East
Haddam, Connecticut (the "19 Lake Drive Agreement"). Pl. Ex. 117. The 19
Lake Drive Agreement provided:

    a. A purported sale of a real estate commission by Newman to Heritage in
the amount of $4,400.00.
    b. Immediate payment of $3,520.00 by Heritage to Newman.
    c. Future payment of $440.00 by Heritage to Newman upon Heritage's
receipt of the real estate sales commission. Pl. Ex. 117.

13

60. Newman testified that the sale of 19 Lake Drive failed to close, because the deal "fell apart." *Testimony of Newman*, AP-ECF No. 102, 01:18:20 – 01:18:35.

61. Newman signed a Notice of Assignment for 19 Lake Drive, in which she represented she was entitled to a sales commission for the sale and that "this is the only assignment" of the commission. Pl. Ex. 128.

62. Newman testified that despite the terms of the 19 Lake Drive Agreement, no money was paid by Heritage to Newman for Newman's commission for the sale of 19 Lake Drive. *Testimony of Newman*, AP-ECF No. 102, 00:52:30 – 00:52:55.

63. Heritage did not offer any evidence of the consideration paid or transferred by Heritage to Newman relating to the 19 Lake Drive Agreement. Moore testified Newman received "value" for the 19 Lake Drive transaction. *Testimony of Moore*, AP-ECF No. 95, 02:27:40 – 02:27:45.

64. Heritage engaged in a practice of "roll over" transactions, whereby, if a sale failed to close after Heritage had already advanced money to an agent, and thus the commission would not be forthcoming, but the debt was still owed, the agent could "roll over" the debt to another prospective commission. *Testimony of Moore*, AP-ECF No. 101, 00:43:00 – 00:44:00. In a roll over, Heritage would simply produce a new set of documents for the agent to sign, and the proceeds from the second transaction would pay off the debt from the first. *Testimony of Moore*, AP-ECF No. 101, 00:43:00 – 00:44:00. Thus from the face of a given Sale and Assignment Agreement, it would be impossible for a non-party to know whether the document represented the transaction it purported to, or if it was a rolled over transaction. It would also be impossible to know from the face of a given Sale and Assignment Agreement whether the amount reported to have been advanced to Newman (or outstanding and owed to Heritage) included Heritage's recapture of any holdback amount or any interest due from a prior – or rolled over – transaction.

65. Moore testified Newman rolled over "quite a number" of transactions, but failed to provide a complete accounting of the number of transactions Newman rolled over. *Testimony of Moore*, AP-ECF No. 101, 00:43:00 – 00:44:00.

66. No reliable evidence was presented by either Heritage or Newman reflecting whether or to what extent the transactions described in Counts 1 through 6 of the complaint were roll over transactions, and accordingly, the court makes no findings of fact on this issue.

67. Newman was the real estate agent for the sale of a property located at 6 Helena Drive, Cromwell, Connecticut. Newman's commission of $12,105.00 for the sale

of that property was paid to Heritage.  *Testimony of Newman*, AP-ECF No. 102, 00:53:00 – 00:53:55.

68. Heritage applied Newman's commission from 6 Helena Drive in part to "address some arrearages" with Newman's account.  *Testimony of Moore*, AP-ECF No. 101, 00:45:50 – 00:46:10.

69. Moore could not identify how many transactions Heritage entered into with Newman during 2012.  *Testimony of Moore*, AP-ECF No. 101, 00:53:10 – 00:53:30.

70. Despite Moore's testimony that it was Heritage's general practice to pay other parties with whom Heritage had a similar arrangement "in two primary ways, one would be an electronic transfer of funds to an agent's account, or the agent could come to the office and pick up a check, or we could even mail a check," and that Heritage paid Newman both via an electronic funds transfer and by check, Heritage did not offer any documents evidencing any transfers of money to Newman.  *Testimony of Moore*, AP-ECF No. 94, 02:14:15 – 02:14:45.

71. Moore could not identify how much money was paid by Heritage to Newman during 2012.  *Testimony of Moore*, AP-ECF No. 101, 00:53:30 – 00:53:40.

72. Newman testified she received approximately $35,000 from Heritage in 2012. *Testimony of Newman*, AP-ECF No. 102, 00:37:15 – 00:37:30.

73. The parties engaged in at least fourteen transactions during the course of their business relationship.  *Testimony of Newman*, AP-ECF No. 102, 01:37:30 – 01:37:40.

74. Moore's testimony, that Heritage transferred "value" to Newman, was vague and evasive. *Testimony of Moore*, AP-ECF No. 94, 02:17:00 - 02:19:00.

75. No accounting of roll over transactions was submitted by either party, and there is no information identifying the properties affected by this informal roll over practice or accounting for the commissions owed to Heritage that the parties agreed would be deemed satisfied as the result of other real property commissions being paid to Heritage.

76. Heritage failed to introduce evidence establishing the date, amount and manner of payment of money by Heritage to Newman.

77. Similarly, Newman failed to introduce evidence establishing the date, amount and manner of payment of money by or on behalf of Newman to Heritage.

78. Although Heritage's counsel alluded to the existence of an accounting, it was not offered. *Testimony of Moore*, AP-ECF No. 101, 01:37:00 – 01:38:30.

79. Moore testified generally that over the course of the parties' financial dealings, he mailed checks in unspecified amounts to Newman or electronically transferred funds to Newman. *Testimony of Moore*, AP-ECF No. 95, 02:14:00 – 02:14:45.

80. Heritage introduced Plaintiff's Exhibit No. 126, a spreadsheet, purporting to represent an accounting of unpaid commissions advanced to Newman. The document contains entries for "Attorneys fees- $100,000.00" and "Treble principal- $86,925.00." The court gives this document no weight because it was prepared in anticipation of this litigation and because it fails to address with specificity the date and amount of each payment by Heritage to Newman, and the date and amount of each payment by or on account of Newman to Heritage.

81. On or about September 28, 2013, Heritage mailed notices of default for the six transactions identified in Counts One through Six to RE/Max Precision Realty. Pl. Ex. 105.

## V.    BURDEN OF PROOF AND APPLICABLE LAW

### A. Burden of Proof

Exceptions to discharge "are strictly and narrowly interpreted so as to promote the Bankruptcy Code's purpose of providing a fresh start to debtors." *Orr v. Marcella (In re Marcella)*, 463 B.R. 212, 219 (Bankr. D. Conn. 2011); *In re Bonnanzio*, 91 F.3d 296, 300 (2d Cir. 1996). "Furthermore, '[t]he burden of proof in a nondischargeability proceeding is on the creditor seeking an exception to discharge to prove, by a preponderance of the evidence, that its claim satisfies the requirements of one of the discharge exceptions enumerated in Bankruptcy Code § 523(a).'" *Vaughn v. Williams (In re Williams)*, 579 B.R. 314, 323 (S.D.N.Y. 2016) (*quoting Syncom Indus., Inc. v. Wood (In re Wood)*, 488 B.R. 265, 273 (Bankr. S.D.N.Y. 2013)); *see also, Grogan v. Garner*, 498 U.S. 279, 287 (1991); *Giminiani v. Cesar*, 536 F.App'x. 85, 87-88 (2d. Cir.

2013) ("To warrant an exception from discharge, a creditor must prove each statutorily

enumerated element of fraud by a preponderance of the evidence.")(summary order).

To succeed on her CUTPA violation counterclaim, Newman must prove by a

preponderance of the evidence that Heritage engaged in an unfair trade practice.

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 219 (2008).

### B. Applicable Law

Heritage's six-count complaint asserts Newman defaulted under the various Sale

and Assignment Agreements, and "attempted to steal the proceeds of the commissions"

assigned to Heritage, committing larceny under Conn. Gen. Stat. §52-564. AP-ECF No.

1, ¶ 15.  Heritage asserts the obligation resulting from Newman's larceny should be

determined to be non-dischargeable pursuant to §§ 523(a)(2)(A), 523(a)(4) and

523(a)(6).

A necessary prerequisite to any action pursuant to § 523(a) is that a debtor must

owe a debt to a creditor. *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).   "A 'debt' is

defined in the Code as 'liability on a claim,' § 101(12), a 'claim' is defined in turn as a

'right to payment,' § 101(5)(A), and a 'right to payment,' we have said, 'is nothing more

nor less than an enforceable obligation.'"  *Cohen*, 523 U.S. at 218. (*quoting*

*Pennsylvania Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)).

Claims for relief pursuant to §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6), are similar,

but distinct.  *Husky Int'l Electronics, Inc. v. Ritz*, 578 U.S. __, 136 S.Ct. 1581, 1588

(2016).  While § 523(a)(2)(A) excepts from discharge debts "obtained by" "false

pretenses, a false representation or actual fraud," § 523(a)(6), "covers debts

17

'for willful and malicious injury,' whether or not that injury is the result of fraud, whereas § 523(a)(2)(A) covers only fraudulent acts." *Husky Int'l*, 136 S.Ct. at 1588 (internal citations omitted).  In pertinent part, § 523(a)(4) excepts from discharge those debts arising from "larceny," which contain fraudulent conduct as an element thereof.  *In re Riveria*, 217 B.R. 379, 384 (Bankr. D. Conn. 1998).  Thus, while one set of facts could trigger all three sections, a violation of one section does not, absent more, trigger application of any other, and §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) must be independently applied to the facts of each case.

i.    Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge those debts arising from "false pretenses, a false representation, or actual fraud."  Though the elements of each overlap, they are distinct.  *Wang v. Guo (In re Guo)*, 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016).

To establish a debt was incurred by "false pretenses" requires a plaintiff establish "'(1) an implied misrepresentation or conduct by the defendant[]; (2) promoted knowingly and willingly by the defendant[]; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff[]; (4) which wrongfully induced the plaintiff[] to advance money, property, or credit to the defendant.'"  *Wang*, 548 B.R. at 401 (*quoting Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y 2016)).

To establish a debt was incurred by a "false representation" requires that a plaintiff establish "'(1) the defendant made a false or misleading statement; (2) with intent to deceive; (3) in order for the plaintiff to turn over money or property to the

18

defendant.'" *Wang*, 548 B.R. at 401 (*quoting Frishberg v. Janac (In re Janac)*, 407 B.R.

540, 552 (Bankr. S.D.N.Y 2009)).

Section 523(a)(2)(A)'s use of the term "actual fraud," refers generally to common

law fraud. *Husky Int'l*, 136 S.Ct. at 1586.[9] "Although 'fraud' connotes deception or

trickery generally, the term is difficult to define more precisely." *Id.* To establish a debt

was incurred by "actual fraud" within the Second Circuit, a plaintiff must establish "false

representation, scienter, reliance, and harm" occurred. *Evans v. Ottimo*, 469 F.3d 278,

283 (2d Cir. 2006).[10]

As to each element of § 523(a)(2)(A), which requires that a plaintiff have relied

on a misrepresentation of a defendant, the plaintiff need only prove by a preponderance

of the evidence, that his or her reliance was "justifiable." *Field v. Mans*, 516 U.S. 59,

73-75 (1995). Justifiable reliance is neither strictly objective, nor subjective.

> [It] does not mean that his conduct must conform to the standard of the
> reasonable man. Justification is a matter of the qualities and
> characteristics of the particular plaintiff, and the circumstances of the
> particular case, rather than of the application of a community standard of
> conduct to all cases. Justifiability is not without some limits, however. . . .
> [A] person is required to use his senses, and cannot recover if he blindly
> relies upon a misrepresentation the falsity of which would be patent to him
> if he had utilized his opportunity to make a cursory examination or
> investigation.

---

[9]   Though not relevant here, *Husky Int'l* highlighted the statute's use of the term "actual" in "actual fraud,"
which it defined as "any fraud that 'involv[es] moral turpitude or intentional wrong'" as opposed to
"'implied' fraud or fraud 'in law,'" which lack the "bad faith or immorality" of actual fraud. *Husky Int'l*, 136
S.Ct. at 1586 (*quoting Neal v. Clark*, 95 U.S. 704, 709 (1878)).

[10]   The Supreme Court's most recent decision on § 523(a)(2)(A), concluded a fraudulent conveyance
constituted "actual fraud." *Husky Int'l*, 136 S.Ct. at 1587-88. Although *Husky* made clear that while a
false representation was not a required element of "actual fraud" under § 523(a)(2)(A), the Supreme
Court declined to adopt an exhaustive or exclusive definition of fraud. *Id. Husky Int'l* did not disturb the
"general common law" elements of "actual fraud." *Id.* ("'Fraud . . . being so various in its nature, and so
extensive in its application to human concerns, it would be difficult to enumerate all the instances in which
Courts of Equity will grant relief under this head.'" (*quoting* 1 J. Story, Commentaries on Equity
Jurisprudence §189, p. 221 (6th ed. 1853)).

*Strata Canada Corp. v. Delia (In re Delia)*, 2013 U.S. Dist. LEXIS 141119, * 32

(S.D.N.Y. September 30, 2013) (*quoting Field*, 516 U.S. at 70-71).

ii.    Section 523(a)(4)

Section 523(a)(4) excepts from discharge those debts arising from "larceny."[11]

Although the complaint seeks relief pursuant to Connecticut's civil larceny statute,

Conn. Gen. Stat. §52-564, "the question of what constitutes . . . larceny within the

meaning of § 523(a)(4) is a question of federal law." *Race Place of Danbury, Inc. v.*

*Scheller (In re Scheller)*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001); *see also Mills v.*

*Caisse (In re Caisse)*, 568 B.R. 6, 15 (Bankr. S.D.N.Y. 2017).   For the purposes of

§ 523(a)(4), "[t]o prove larceny, the plaintiff must show that the debtor 'wrongfully took

property from the rightful owner with fraudulent intent to convert such property to [the

debtor's] own use without the owner's consent.'" *In re Nofer*, 514 B.R. 346, 357 (Bankr.

E.D.N.Y. 2014) (*citing Moore v. U.S.*, 160 U.S. 268, 270 (1895)).   Critically, larceny

requires "the felonious intent must have existed at the time of the taking." *Moore*, 160

U.S. at 270; *see also Caisse*, 568 B.R. at 15 ("Larceny is the fraudulent and wrongful

taking and carrying away of the property of another with intent to convert the property to

the taker's use without the consent of the owner. As distinguished from embezzlement,

the original taking of the property must be unlawful.") (*quoting* 4 Collier ¶ 523.10[2], at

523-77)

---

[11]    In pre-trial argument, counsel for Heritage expressly stated it sought relief pursuant to § 523(a)(4)
only under a theory that Newman committed "larceny," and expressly declined to pursue relief under a
theory that Newman committed "fraud or defalcation . . . in a fiduciary capacity, [or] embezzlement" under
§ 523(a)(4). AP-ECF No. 94, 00:08:30 – 00:09:00.

iii.    Section 523(a)(6)

Section 523(a)(6) excepts from discharge those debts arising from "willful and malicious injury by the debtor."  "The word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury not a deliberate or intentional act that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).  The Supreme Court has rejected an expansive interpretation of § 523(a)(6), analogizing, that while "intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic" is itself an intentional act, the resulting injury of an innocent bystander is not intentional, and therefore, not "willful" to render the debt non-dischargeable under § 523(a)(6).  *Kawaauhau*, 523 U.S. at 61-62.  *Kawaauhau* further rejected the notion that a debt arising from a mere "knowing breach of contract," absent more, would qualify as "willful" under the statute. *Kawaauhau*, 523 U.S. at 61-62.

Additionally, Heritage must also prove its debt resulted from Newman's "malicious" actions, and that she acted "wrongful[ly] and without just cause or excuse." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (*quoting In re Steluti*, 94 F.3d 84, 87 (2d Cir. 1996)).  "A debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances."  *Marcella*, 463 B.R. at 222 (*quoting Econ. Dev. Growth Enters. Corp. v. McDermott (In re McDermott)*, 434 B.R. 271, 283 (Bankr. N.D.N.Y. 2010)).

iv.    CUTPA

Newman seeks through her counterclaim against Heritage, a determination that Heritage violated CUTPA.  AP-ECF No. 28, ¶¶1-6 (Page 9).  CUTPA provides, "[n]o

21

person shall engage in unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b.

When determining if an act or practice is "unfair" for purposes of CUTPA,

courts look to the following factors:

> (1)   whether the practice, without necessarily having been
> previously considered unlawful, offends public policy as it
> has been established by statutes, the common law or
> otherwise—in other words, it is within at least the penumbra
> of some common law, statutory, or other established concept
> of unfairness;
>
> (2)   whether it is immoral, unethical, oppressive, or
> unscrupulous;
>
> (3)   whether it causes substantial injury to consumers ...
>
> *3N Int'l, Inc. v. Carrano (In re Carrano),* 530 B.R. 540, 555 (Bankr.
> D. Conn. 2015) (*quoting Harris v. Bradley Mem. Hosp. and Health
> Ctr., Inc.*, 296 Conn. 315, 350 (2010)).

A plaintiff need not establish all three criteria in order to support a finding of unfairness.

*Carrano*, 530 B.R. at 555.

Where a party raises a claim, but fails to pursue it, the court may deem the claim

abandoned. *See, Gilgo v. Derman*, 560 F.Supp.2d 163, 174 (D. Conn. 2008).

## VI.   DISCUSSION[12]

During the trial, the precise nature of the transactions between Heritage and

Newman was vigorously contested by the parties. While the parties engaged in at least

fourteen (14) financial transactions during 2012, the parties offered limited information

about only some of them during trial.

---

[12]   To the extent not referenced above, the court also finds additional facts as described herein.

Heritage asserts it was engaged in factoring transactions with Newman, and that Newman "sold" her commissions to Heritage.  AP-ECF No. 114.  According to Heritage, Newman's debt should not be discharged because Newman forged the signature of her broker on the Notices of Assignment; falsely represented that monies paid by Heritage to Newman pursuant to the various Sale and Assignment Agreements were to be used for business purposes; used money she received from Heritage for personal expenses; failed to turn over commissions to Heritage; and, caused Heritage to suffer injury as a result.  In short, Heritage seeks a determination that more than $178,000 is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6).

Newman did not dispute she signed the Master Security Agreement, the six Sale and Assignment Agreements, the six Notices of Assignment (both for herself and Joseph Fazekas) or the Business Purpose Checklist.  However, she testified she understood the transactions to be loans.  *Testimony of Newman*, AP-ECF No. 102, 00:24:00 – 00:24:20.  Newman's answer to the complaint asserted she repaid such advances, and she testified – without introducing any documentation into evidence to support the assertion – that she repaid $51,000.00 to Heritage.  AP-ECF No. 28; No. 102, 01:20:50 - 01:21:00.  She disputed that her act of signing the broker's name on the Notices of Assignment was forgery, asserting she had authorization to sign Joseph Fazekas's name on behalf of RE/Max Marketplace and argues that any advances she received from RE/Max Marketplace were general in nature rather than tied to specific transactions.  Her counterclaim asserted Heritage engaged in unfair and deceptive business practices in violation of CUTPA, as Heritage was not licensed to make "small consumer loans" in Connecticut and charged usurious interest.  AP-ECF No. 28.

23

*Reliability of the Sale and Assignment Agreements*

With regard to the Sale and Assignment Agreements, Moore was candid that in most cases he could not confirm whether Heritage actually paid Newman the amount set forth in the Sale and Assignment Agreement, or whether the consideration was money or other unspecified "value."  The parties agreed, in general terms, that some of the transactions were "roll over" transactions.  Given that the central dispute here starts with the question of how much Newman owes Heritage, it was striking that neither party provided documentary evidence such as bank statements, copies of checks or other financial information to explain who paid what to whom, or when.  Both Moore and Newman conceded the Sale and Assignment Agreements did not accurately reflect the parties' course of dealing with one another.  *Testimony of Newman*, AP-ECF No. 102, 00:37:30 – 00:37:55; *Testimony of Moore*, AP-ECF No. 101, 00:43:00 – 00:44:00. Moore acknowledged that the record before the court contains only a snapshot of many rolled over transactions. The court concludes the Sale and Assignment Agreements are generally unreliable because a review of those Agreements fails to accurately reflect the following:  the amount of money Heritage paid Newman; whether a given transaction was a roll over transaction; and, whether, if a roll over, the figure states in each Agreement was the result of set-offs from other transactions, interest or fee accruals or new consideration paid to Newman.

*The Nature of Newman's Transactions with Heritage*

For her part, Newman understood and expected that if a real estate closing failed and Heritage was not paid, she would still owe Heritage the money she had received. Aside from the question of whether the transactions were loans or part of a factoring

arrangement, Newman's overall understanding of the transactions is relevant to her

state of mind, and thus relevant to the substantive allegations of fraud common to each

count of the complaint. *Evans*, 469 F.3d at 283. Newman's own testimony was that

she was only entitled to a commission if the sale closed, and if a sale did not close, she

still owed Heritage any money that had been advanced for the transaction. She

repeatedly testified that she had understood the transactions were loans,

notwithstanding the language of the various Heritage documents that Heritage asserted

created a factoring relationship. Newman's testimony on this point is consistent with the

Master Security Agreement that provided for different remedies in the event of a

delayed or incomplete closing. Pl. Ex. 102.

The court need not determine whether the transactions were factoring

agreements, or simply loans, to make the determination of whether the outstanding debt

owed by Newman to Heritage – if any – is non-dischargeable. However, the court notes

that Heritage's characterization of these transactions does not comport with the

generally accepted definition of factoring, and the parties themselves behaved as if the

transactions were loans rather than true sales of the commissions. Factoring is defined

as "[t]he buying of accounts receivable at a discount. The price is discounted because

the factor (who buys them) assumes the risk of delay in collection and loss on the

accounts receivable." FACTORING*, Black's Law Dictionary* (9th ed. 2009). Three

parties exist in a factoring transaction, the factor, who buys the account receivable from,

a client, and an account debtor, whose account has been sold. A leading treatise

defines a "factor" as "a person who purchases trade accounts at a discount from its

clients in a 'true sale,' taking title to the accounts as a matter of law." David B. Tatge, et

25

al., *American Factoring Law*, 895 (1st ed. 2009).  Here, the third party relating to each transaction would have been Newman's client – the residential home seller or purchaser.

However, "[w]here the factor assumes no credit risk and purchases accounts with full recourse, most cases characterize the transaction as a secured borrowing rather than a true sale of accounts." *American Factoring Law*, 268; *see also, Dessert Beauty Inc. v. Platinum Funding Corp.*, 519 F.Supp.2d 410, 413 (S.D.N.Y. 2007) ("In return for the right to collect on the invoice and retain the difference between the invoice amount and the discounted purchase price, the factor assumes the "credit risk on the accounts, defined as the financial inability of the account debtor to pay."); *Fenway Fin. LLC v. Greater Columbus Realty, LLC*, 995 N.E.2d 1225, 1232-34 (Ohio Ct. App. 2013) (*quoting Lange v. Inova Capital Funding LLC (In re Qualia Clinical Servs.)*, 441 B.R. 325, 330 (8th Cir. B.A.P. 2011) ("In instances "[w]here the 'seller' retains 'virtually all of the risk of noncollection,' the transaction cannot properly be considered a true sale.")). Here, Newman retained all the risk and Heritage retained full recourse to collect any unpaid amounts from Newman.  If a given transaction did not close and therefore no commission would be earned, or if Newman simply did not pay an earned commission to Heritage, both Newman and Heritage understood that Heritage could pursue Newman to collect the debt.

### The Forged Notices of Assignment

Newman signed her name to six documents entitled "Notice of Assignment," which purported to:  a) inform RE/Max Marketplace, Newman's licensed real estate broker that supervised her work as a real estate agent, that Heritage was entitled to be

paid sales commissions that she earned upon the closing of specific real estate

transactions; and, b) direct RE/Max Marketplace to pay such commissions directly to

Heritage.  Newman also signed the name of Joseph Fazekas of RE/Max Marketplace

on the Notices of Assignment.  While Newman testified that she had authorization to

sign Joseph Fazekas' name, Mr. Fazekas testified that she did not.  Heritage asserted

that Newman forged Mr. Fazekas' signature.  However, even if Newman did forge Mr.

Fazekas' signature, the forgery was not material to the financial transactions described

in the complaint because, according to Moore, the Notices of Assignment were required

to be completed for each transaction *after* the commissions were sold to Heritage.

*Testimony of Moore*, AP-ECF No. 94, 01:32:20 – 01:32:50; 01:36:00 – 01:38:20.  There

was no evidence that the Notices of Assignment, forged or not, had any bearing on

whether Heritage agreed to purchase a commission from Newman or paid money to

Newman.  Heritage could not have relied on the forged Notices of Assignment before

funding because as the parties described the transactions, the forgery post-dated each

sale of a commission.

As to the specific point of whether or not Newman actually signed Fazekas' name

to the Notices of Assignment without Fazekas' authorization, the court concludes that

Heritage failed to establish this fact by a preponderance of the evidence.  Newman,

Patrick Severese (Newman's adult son who worked at RE/Max Marketplace for a

time),[13] and Elizabeth Scalise testified that Fazekas had given Newman authorization to

sign his name at times, and specifically, Ms. Scalise testified Fazekas gave her

authorization to sign his name at times.  Although Fazekas denied giving Newman

---

[13]  Little weight was given to the testimony of Patrick Severese, Newman's son, because of the familial
relationship.

permission to sign his name, he acknowledged that he was rarely in the RE/Max

Marketplace office in 2012.  Considering the balance of the evidence and the credibility

of the witnesses, the court cannot conclude Newman signed Fazekas' signature on the

Notices of Assignment without his authorization.

*Justifiable Reliance by Heritage*

To prevail on its claims under § 523(a)(2)(A), Heritage must establish by a

preponderance of the evidence that it did not, "blindly [rely] upon a misrepresentation

the falsity of which would be patent to [it] if [it] had utilized [its] opportunity to make a

cursory examination or investigation."  *Field,* 516 U.S. at 70-71.  Here Heritage has not

met its burden.  The extensive testimony of both Moore and Newman regarding the roll

over nature of at least some of the six transactions identified in the six counts of the

complaint undercuts Heritage's effort to establish that it justifiably relied on Newman's

representations in the various Heritage documents about the fail-safe nature of a

particular real estate transaction.  The purpose of each roll over transaction was to

cover for one or more failed real estate closings where the commissions had not, in fact,

been earned by Newman or were earned but not paid to Heritage.  Significantly, no

accounting of the extent of the roll over transactions was presented through testimony

or documents.

The evidence is uncontroverted that Heritage knew that Newman's transactions

frequently did not close.  When a closing did not occur, Heritage frequently rolled over

the liability from the failed transaction into another transaction, hoping to be repaid.  As

previously stated, the parties acknowledged that the Sale and Assignment Agreements

did not accurately reflect the parties' course of dealing.  Thus, to the extent Heritage

28

relied on Newman's signature on a given document, the admitted inaccuracies and lack of transparency (on both sides) in the Sales and Assignment Agreements undermine the justifiableness of Heritage's reliance on that documentation.

*The Parties' Competing Theories of the Case*

Heritage's theory of the case rested almost exclusively on the documents submitted into evidence.  In short, Newman signed six Sale and Assignment Agreements in which Heritage agreed to pay Newman money in exchange for Newman selling her right to receive a commission for the sale of six specific homes.  Taken strictly at face value, they purport to paint a clear picture of the terms to which Newman and Heritage agreed.

Newman's defense was that Heritage failed to perform its end of the bargain, because, in all but two cases described in more detail below, Heritage did not actually pay Newman any money.   Although Newman's testimony at trial was possibly self-serving and not entirely forthcoming, it was also unrebutted on the point that Heritage did not advance Newman the funds as described on the six Sale and Assignment Agreements.

Heritage, for its part, did not offer any evidence that it in fact paid Newman money according to the terms of the six Sale and Assignment Agreements.  Rather, when asked – repeatedly – whether Heritage paid Newman money, Moore could not give a clear or coherent answer, and stated only that Newman received some form of "value" as consideration.  Although Moore alluded to the existence of accounting records, Heritage did not submit any proof that it complied with this essential term of the various Agreements.

29

Instead, Moore testified extensively that Heritage and Newman frequently entered into roll over transactions to "cover" for other, failed transactions. But, Heritage failed to submit evidence as to which transactions were roll over transactions or how much principal, interest, or fee was rolled over in each instance. This testimony undermined the credibility of the six Sale and Assignment Agreements, because it suggested to the court that the terms of the written Agreements were not representative of the parties' actual agreements or arrangement or course of conduct.

Heritage cannot have it both ways – it cannot simply point to a Sale and Assignment Agreement as evidence of Newman's liability for a transaction and simultaneously acknowledge or admit that the Sale and Assignment Agreements do not reflect the actual terms of the transactions. The admitted absence of any records, testimony, or credible evidence substantiating the amount of funds advanced, payments received, date of default, interest and fees charged for "cover" or "roll over" transactions, undermines Heritage's theory of the case.

### A. Count 1: 11 Lake Drive

Newman admitted that she was paid $5,008.00 from Heritage for the 11 Lake Drive transaction, but disputed that the amount paid to her was the $5,400.00 recited in the 11 Lake Drive Agreement. *Testimony of Newman*, AP-ECF No. 102, 00:50:30 – 00:50:55. The sale of 11 Lake Drive failed to close. *Testimony of Newman*, AP-ECF No. 102, 01:43:50 – 01:44:00. Moore testified that Newman had received "value" for the transaction, without identifying what that value might have been, when it was paid or given.[14] *Testimony of Moore*, AP-ECF No. 94, 02:17:05 – 02:17:10. It appears

---

[14]     Moore testified that the "value" Heritage transferred to Newman in the 11 Lake Drive transaction, may have been from a covered or roll over transaction relating to another property.

undisputed that the documentation between the parties contained certain statements

that were not strictly accurate, including the amount of money paid by Heritage to

Newman, and whether Newman had already sold a portion of the commission to

another party.  None of these things were as set forth in the paperwork because

Heritage paid Newman $5,008.00 in money (rather than $5,400.00) and Newman sold

$500.00 of the commission to another party (RE/Max Marketplace) before entering into

the 11 Lake Drive Agreement. [15]

However, assuming Newman still owed Heritage the $5,008.00 she admits she

received, Heritage failed to establish by a preponderance of the evidence that this debt

was incurred by "false pretenses, a false representation, or actual fraud."  11 U.S.C.

§ 523(a)(2)(A).  A common element to each of the three exceptions to discharge is that

a creditor must prove the debtor acted with some degree of "scienter."  *Evans*, 469 F.3d

at 283 (requiring evidence of "scienter" to establish "actual fraud"); *Wang*, 548 B.R. at

401 (requiring evidence of a debtor's "intent to deceive" to establish "false

---

Counsel for Heritage: Was in fact the money paid by Commission Express, Heritage Equities, to Nancy Newman as described in Exhibit 113?

Moore: She has received value for that, now that value could have been an electronic transfer of funds, it could have been a check, or it could have been a check towards past due amounts owed [Heritage].

Counsel for Heritage: Ok, now is the recitation of $5,400.00, Line 3(a) [of Pl. Ex. 113], true and accurate that that's the amount of value given?

Moore: That would be the amount of value given. I think that in this particular instance, it was credited to Ms. Newman's accounts.

   *Testimony of Moore*, AP-ECF No. 94, 02:17:00 – 02:18:15.
[15]   Pl. Ex. 122, is a copy of a check from RE/Max Marketplace, payable to Newman, dated August 10, 2012, for $500.00.  Although the writing is difficult to read, the court interprets the memoranda as "11 Lake Advance Moodus."  Pl. Ex. 122.  This is consistent with Pl. Ex. 118, a ledger from RE/Max Marketplace and Newman acknowledged the check appeared to be a "loan" to her from RE/Max Marketplace.  *Testimony of Newman*, AP-ECF No. 102, 00:43:30 – 00:44:30.  The 11 Lake Drive Agreement is dated August 23, 2012, after the August 10th check to Newman.  Pl. Ex. 113.

representation"); *Wang*, 548 B.R. at 401 (requiring evidence a debtor "knowingly and willingly" promoted a false representation).

Here, Heritage alleged Newman made a false statement in the 11 Lake Drive Agreement because she had received a $500.00 advance from RE/Max Marketplace against her sales commission, and therefore the representation that there were no set-offs to her right to receive the full commission was not true.  AP-ECF No. 113, Pl. Ex. 122, *Testimony of Newman*, AP-ECF No. 102, 00:43:30 – 00:44:30.  Newman's claim she did not receive the entire amount stated in the 11 Lake Drive Agreement was undisputed by Moore who testified only that Newman received unspecified "value," so that was not established to be accurate.

Newman's testimony was that she viewed the $500.00 advance and other similar advances from RE/Max Marketplace on her sales commissions, such as 11 Lake Drive, as separate from her various transactions with Heritage.  *Testimony of Newman*, AP-ECF No. 102, 00:43:00 – 00:43:30.  Newman testified regarding whether she was, at the time she signed the 19 Lake Drive Agreement,[16] "entitled" to a sales commission. This testimony, though it relates to a different transaction, is nevertheless probative of her confusion regarding the alleged legal subtleties of her transactions with Heritage. *Testimony of Newman*, AP-ECF No. 102, 01:53:20 – 01:55:00.

When Newman's testimony on this point is considered with Moore's candid testimony that the face of the Heritage documentation did not reflect the salient details of the financial transactions by identifying if cash was paid or if the amount identified in an agreement was a "roll over" to "cover" for some other liability, and in the absence of

---

[16]   The text of the 19 Lake Drive Agreement is virtually identical to the text of the 11 Lake Drive Agreement.

a coherent accounting of the roll over transactions, the court cannot conclude that

Newman acted with the requisite "scienter" to defraud or induce Heritage into the 11

Lake Drive transaction.  *Evans*, 469 F.3d at 283.  The parties clearly anticipated that

there might be – or perhaps likely would be – times when a given real estate transaction

did not close, or that Heritage would not be paid as anticipated.  *See,* Pl. Ex. 102, ¶2.

The parties' Master Security Agreement contemplated that there would be

consequences including a forfeit of the holdback amount and increased interest charges

imposed after a limited number of days if Newman "wrongfully receives payment of any

account receivable" or the settlement agent for a closing changed, or after a certain

grace period, including that Newman would remain liable to Heritage.  Pl. Ex. 102.

Additionally, Heritage failed to establish by a preponderance of the evidence that

its reliance on Newman's statements in the 11 Lake Drive Agreement, and other

documents related to this transaction, was justifiable.  Moore's testimony regarding the

frequent practice of covering losses on one transaction by rolling over a liability to

another transactions leads the court to conclude that Heritage's reliance on Newman's

statements in the 11 Lake Drive Agreement and other related documents was not

justifiable.  *Field*, 516 U.S. at 70-71.  Newman said she received only $5,008.00 related

to 11 Lake Drive while Moore was only able to state that Heritage gave Newman

"value."  Moore's testimony begs the question of what other information or consideration

was involved in Heritage paying Newman only some of the value identified in the 11

Lake Drive Agreement.

Because the court construes exceptions to discharge narrowly, the court

concludes Heritage failed to establish by a preponderance of the evidence that Newman

acted with the requisite intent, or that Heritage justifiably relied on Newman's representations, to establish the debt represented by the 11 Lake Drive Agreement was incurred by "false pretenses, a false representation, or actual fraud" as required by § 523(a)(2)(A).[17] *Grogan*, 498 U.S. at 287; *Field*, 516 U.S. at 70-71; *Wang*, 548 B.R. at 401; *Marcella*, 463 B.R. at 219.

Heritage also failed to establish that its debt for the 11 Lake Drive transaction was incurred by "larceny," as required by § 523(a)(4). Heritage failed to demonstrate by any evidence whatsoever that Newman, at the time of signing the 11 Lake Drive Agreement, acted with the "felonious intent" to "wrongfully" take Heritage's property and so the court cannot conclude that the debt is non-dischargeable under § 523(a)(4). *Moore,* 160 U.S. at 270; *Nofer,* 514 B.R. at 357. To the extent Heritage relied on the $500.00 advance from RE/Max Marketplace as evidence of Newman's felonious intent regarding the apparent obligation to pay $6,075.00 ($5,400.00 advance, plus $675.00 fee = $6,075.00 if paid timely)[18], that reliance is misplaced since the remaining amount purportedly due from the transaction would have paid Heritage in full, after setoff of the $500.00 advance. While the transaction failed to close, that eventuality was contemplated in the Master Security Agreement, and therefore, the court declines to conclude that Heritage established larceny on these facts.

---

[17]   Additionally, a simple failure to repay the $5,008.00 debt arising under the 11 Lake Drive Agreement, absent more, is not sufficient for this court to find that that debt is non-dischargeable. *See, In re Macias*, 324 B.R. 181, 188 (Bankr. E.D.N.Y. 2004) (Holding "debtor's failure to repay, standing alone, does not establish a lack of intent to repay when the debt was incurred," and the debt was not non-dischargeable under § 523(a)(2)(A)).

[18]   Note that this formula illustrates the magnitude of the misrepresentation and is not a finding of an amount due. As noted, without an accounting or evidence of amounts advanced or value provided, the court cannot conclude what is owed.

With regard to a violation of § 523(a)(6), Heritage failed to establish that its debt was incurred by "willful and malicious injury" rather than a knowing breach of contract. 11 U.S.C. § 523(a)(6). Heritage failed to demonstrate by a preponderance of evidence that Newman acted willfully and maliciously within the meaning of § 523(a)(6) by failing to repay such a debt. *Marcella*, 463 B.R. at 222.

### B. Count 2: 1053 Middle Turnpike East

As to Count 2 of the complaint, Heritage did not meet its burden to show that the benefit Newman received from entering into the 1053 Middle Turnpike Agreement with Heritage was obtained through "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). First, Newman testified that despite the terms of the 1053 Middle Turnpike Agreement, no money was paid by Heritage to Newman for Newman's commission for the sale of 1053 Middle Turnpike East. *Testimony of Newman*, AP-ECF No. 101, 01:31:34 – 01:32:30. Moore testified only that Newman received an unspecified amount of "value" for the purported sale of her sales commission to Heritage.[19] *Testimony of Moore*, AP-ECF No. 94, 02:18:50 – 02:19:00. Moore's testimony on this point – the amount or nature of consideration that was provided to Newman, whether in terms of money, or credit toward a debt owed to Heritage – was

---

[19]   Counsel for Heritage affirmatively declined to introduce an accounting of the "value" paid to Newman, and relied on the Sale and Assignment Agreements and other documents introduced into evidence.

> The Court: [To Counsel for Heritage], are you intending to at some point to put into the record the amount of consideration advanced on each of these Account Receivable Sale and Assignment Agreements?

> Counsel: No.

> The Court: Is there a reason you're not intending to do that?

> Counsel: I don't think its material.

> *Testimony of Moore*, AP-ECF No. 94 02:11:00 – 02:11:30.

vague, and the court gives it little weight.  The court concludes Heritage has not

established by a preponderance of the evidence that Newman owes a debt to Heritage

for the sale of her sales commission for 1053 Middle Turnpike East, as alleged in Count

2.  *Cohen*, 523 U.S. at 218.

In this instance, the underlying real estate transaction did close and Attorney

Pentore testified that he was the settlement agent for the transaction.  He also testified

that both Moore and Newman authorized him to deliver the commission check Newman

had earned for the transaction to RE/Max Marketplace instead of to Heritage as

required by the 1053 Middle Turnpike Agreement and Notice of Assignment.  *Testimony*

*of Pentore*, AP-ECF No. 94, 00:38:40 – 00:39:40.  Neither Newman nor Moore disputed

this account by Attorney Pentore.

In the alternative, if a debt exists, given Moore's testimony that unspecified

"value" was provided to Newman for the commission she purportedly sold to Heritage,

the court cannot conclude that Heritage established by a preponderance of the

evidence that Newman acted with the requisite intent, to establish that Heritage

justifiably relied on Newman's representations, or that the debt owed was incurred by

"false pretenses, a false representation, or actual fraud," as required by § 523(a)(2)(A).

[20]  *Grogan*, 498 U.S. at 287; *Field*, 516 U.S. at 73-75; *Wang*, 548 B.R. at 401; *Marcella*,

463 B.R. at 219.

For substantially the same reasons previously discussed, Heritage failed to

demonstrate by any evidence whatsoever, that Newman acted with the "felonious

---

[20]   Heritage also pointed to Pl. Ex. 120, a copy of a check from RE/Max Marketplace payable to
Newman, for $1,000.00, with the memoranda "Advance 1153 [sic] Middle Turnpike."  Pl. Ex. 120.  That
check is dated after Newman signed the 1053 Middle Turnpike Agreement and is given little weight.

intent" to "wrongfully" take Heritage's property to satisfy § 523(a)(4), or that Newman

acted willfully or maliciously to satisfy § 523(a)(6).  *Moore,* 160 U.S. at 270; *Nofer,* 514

B.R. at 357; *Marcella*, 463 B.R. at 222.   Later events, including the direction from

Moore to Attorney Pentore to redirect the real estate commission from Heritage to

RE/Max Marketplace, further undermine the larceny claim.

C.  Count 3: 213 Alling Street.

As to Count 3 of the complaint, despite the express terms of the 213 Alling Street

Agreement, Newman did not receive any consideration for the sale of her commission

for 213 Alling Street.   When specifically asked by Newman's counsel "how much

money did Commission Express pay to Nancy Newman for 213 Alling Street," Moore

replied "zero."  *Testimony of Moore*, AP-ECF No. 101, 00:54:10 – 00:54:30.  Moore's

admission that Heritage did not pay Newman any money under the 213 Alling Street

Agreement, together with a failure to introduce any evidence of whether and to what

extent this transaction was a "roll over" transaction, if it was, dooms Heritage's claim

that a debt stemming from the 213 Alling Street Agreement remains outstanding.

*Cohen*, 523 U.S. at 218.  Heritage has therefore failed to establish by a preponderance

of the evidence that such a debt is non-dischargeable under §§ 523(a)(2)(A), 523(a)(4)

or 523(a)(6).  *Grogan*, 498 U.S. at 286-87.  The court is therefore unable to afford relief

on that count.

To the extent such a debt could be found however, Heritage failed to establish by

a preponderance of the evidence that it was incurred by "false pretenses, a false

representation, or actual fraud."  § 523(a)(2)(A).  For the reasons discussed above, the

court does not conclude that Newman acted with the requisite scienter, or that Heritage

justifiably relied on Newman's statement, to establish such a debt would be non-dischargeable under § 523(a)(2)(A). *Field*, 516 U.S. at 73-75; *Evans*, 469 F.3d at 283.

For substantially the same reasons previously discussed, Heritage failed to demonstrate by any evidence whatsoever, that Newman acted with the "felonious intent" to "wrongfully" take Heritage's property to satisfy § 523(a)(4), or that Newman acted willfully or maliciously to satisfy § 523(a)(6). *Moore,* 160 U.S. at 270; *Nofer,* 514 B.R. at 357; *Marcella*, 463 B.R. at 222.

### D. Count 4: 37 Sunridge Lane

As to Count 4 of the complaint, despite the express terms of the 37 Sunridge Lane Agreement, Newman did not receive any consideration from Heritage for the sale of her commission for 37 Sunridge Lane. *Testimony of Newman*, AP-ECF No. 102, 01:15:25 – 01:15:35. Moore testified only that Newman received an unspecified amount of "value" for the purported sale of her commission. *Testimony of Moore*, AP-ECF No. 95, 02:19:00 – 02:19:20. Moore's testimony on this point was vague, and the court gives it little weight. In contrast, Newman's testimony that she received no payment for this transaction was unambiguous. The court concludes Heritage has not established that Newman owes a debt to Heritage for the sale of her commission for the 37 Sunridge Lane transaction, as alleged in Count 4. *Cohen*, 523 U.S. at 218. Heritage has therefore failed to establish by a preponderance of the evidence that such a debt is non-dischargeable under §§ 523(a)(2)(A), 523(a)(4) or 523(a)(6). *Grogan*, 498 U.S. at 286-87. The court is therefore unable to afford relief under that count.

To the extent such a debt could be found however, Heritage has failed to establish by a preponderance of the evidence that its debt was incurred by "false

pretenses, a false representation, or actual fraud." § 523(a)(2)(A). For the reasons

discussed above, the court does not conclude that Newman acted with the requisite

scienter, or that Heritage justifiably relied on Newman's statement, to establish such a

debt would be non-dischargeable under § 523(a)(2)(A). *Field*, 516 U.S. at 73-75;

*Evans*, 469 F.3d at 283.

For substantially the same reasons discussed previously, Heritage failed to

demonstrate by any evidence whatsoever, that Newman acted with the "felonious

intent" to "wrongfully" take Heritage's property to satisfy § 523(a)(4), or that Newman

acted willfully or maliciously to satisfy § 523(a)(6). *Moore,* 160 U.S. at 270; *Nofer,* 514

B.R. at 357; *Marcella*, 463 B.R. at 222.

### E. Count 5: 12 Clubhouse Drive

As to Count 5 of the complaint, the court finds Newman received $2,000.00 from

Heritage regarding the 12 Clubhouse Drive transaction. *Testimony of Newman*, AP-

ECF No. 102, 00:51:20 – 00:52:15. The court makes this finding based on Newman's

admission Heritage paid $2,000.00 and despite Moore's vague testimony that Newman

received "value" in accordance with the 12 Clubhouse Drive Agreement.[21] *Testimony of*

*Moore*, AP-ECF No. 94, 02:17:05 – 02:17:10. However, Heritage failed to establish by

a preponderance of the evidence that such a debt is non-dischargeable under

§§ 523(a)(2)(A), 523(a)(4) or 523(a)(6). *Grogan*, 498 U.S. at 286-87.

Heritage failed to establish by a preponderance of the evidence that its debt was

incurred by "false pretenses, a false representation, or actual fraud." § 523(a)(2)(A). To

---

[21]    When asked specifically by Newman's counsel to clarify his testimony on the amount of value
Heritage paid to Newman for her commission for 12 Clubhouse Drive, by stating "Moore testified that Ms.
Newman received $3,360.00," Moore responded that Newman received "value of some sort" for the 12
Clubhouse Drive transaction. *Testimony of Moore*, AP-ECF No. 94, 02:23:30 – 02:24:00.

the extent Newman made a false statement at the time she signed the 12 Clubhouse

Drive Agreement, it is impossible for the court to conclude that the $2,000.00 paid by

Heritage to Newman was not repaid and that any debt is owed regarding the 12

Clubhouse Drive transaction.  Moore acknowledged that Heritage had received some

payments from Newman – including funds from the 6 Helena Drive closing discussed in

subsection G below – and those payments exceeded the $2,000.00 amount presented

at trial.  Because there is no account of who paid what when, or of the interest or fees

that were charged, the court declines to conclude that a debt was incurred by false

pretenses, a false representation or actual fraud or that one remains outstanding.

§ 523(a)(2)(A).

Additionally, as noted previously, to the extent Heritage argued that Newman

falsely represented that she was, at the time she signed the 12 Clubhouse Drive

Agreement, "entitled" to a commission, the court notes that Newman testified that she

was confused about some of the aspects of the transactions and based on the actual

documentation submitted during the trial, that confusion was not unjustified.  *Testimony

of Newman*, AP-ECF No. 102, 01:53:20 – 01:55:00.  The parties' obvious deviation from

the written documents illustrates they were both operating on a set of facts different

from what they were writing down on paper.  In this circumstance, the court concludes

Heritage failed to meet its burden to establish the elements of non-dischargeability by a

preponderance of the evidence.

Heritage presented no other evidence of any false statement made by Newman

as to this count.[22]  The larceny claim is unpersuasive because both parties understood

---

[22]    The 12 Clubhouse Drive Agreement was signed on September 27, 2012.  Pl. Ex. 116.  Pl. Ex. 118
and 119, reference a payment of $2,012.00 by RE/Max Marketplace to Newman on November 6, 2012.

40

and agreed that if a transaction failed to pay it would be rolled over, or more interest would be due. *See,* Pl. Ex. 102. Because the court construes exceptions to discharge narrowly, the court concludes Heritage failed to establish, by a preponderance of the evidence, that Newman acted with the requisite intent to establish the debt, to the extent it exists, was incurred by "false pretenses, a false representation, or actual fraud" and is non-dischargeable under § 523(a)(2)(A). *Grogan*, 498 U.S. at 287; *Wang*, 548 B.R. at 401; *Marcella*, 463 B.R. at 219.

For substantially the same reasons discussed previously, Heritage failed to demonstrate by a preponderance of the evidence that Newman acted with the "felonious intent" to "wrongfully" take Heritage's property to satisfy § 523(a)(4), or that Newman acted willfully or maliciously to satisfy § 523(a)(6). *Moore* 160 U.S. at 270; *Nofer,* 514 B.R. at 357; *Marcella*, 463 B.R. at 222.

F. Count 6: 19 Lake Drive

As to Count 6 of the complaint, despite the terms of the 19 Lake Drive Agreement, Newman did not receive any consideration for the sale of her commission for 19 Lake Drive. *Testimony of Newman*, AP-ECF No. 102, 00:52:30 – 00:52:55. Moore testified only that Newman received an unspecified amount of "value" for the sale of her commission. *Testimony of Moore*, AP-ECF No. 95, 02:27:40 – 02:27:45. Moore's testimony on this point was vague, and the court gives it little weight. In contrast, Newman's testimony as to this transaction was unambiguous that she

---

However, that payment appears to have had no bearing on whether Newman made a false statement at the time the parties executed the 12 Clubhouse Drive Agreement. Even if Newman did cash the check, and did not use those funds to repay Heritage, a simple failure to repay the $2,000.00 debt arising under the 12 Clubhouse Agreement, absent more, is not sufficient for this court to find that that debt is non-dischargeable. *See, Macias*, 324 B.R. at 188 (holding "debtor's failure to repay, standing alone, does not establish a lack of intent to repay when the debt was incurred," and the debt was dischargeable).

received no money.  The court concludes Heritage has not established that Newman

owes a debt to Heritage for the sale of her commission for 19 Lake Drive, as alleged in

Count 6.  *Cohen*, 523 U.S. at 218.   Heritage has therefore failed to establish by a

preponderance of the evidence that such a debt is non-dischargeable under

§§ 523(a)(2)(A), 523(a)(4) or 523(a)(6).  *Grogan*, 498 U.S. at 286-87.

To the extent such a debt could be found however, Heritage has failed to

establish by a preponderance of the evidence that its debt, such that it exists, was

incurred by "false pretenses, a false representation, or actual fraud."  § 523(a)(2)(A).  A

common element to each of the three exceptions to discharge is that a creditor must

prove the debtor acted with some degree of "scienter."  *Evans*, 469 F.3d at 283

(requiring evidence of "scienter" to establish "actual fraud"); *Wang*, 548 B.R. at 401

(requiring evidence of a debtor's "intent to deceive" to establish "false representation");

*Wang*, 548 B.R. at 401 (requiring evidence a debtor "knowingly and willingly" promoted

a false representation).  Newman's testimony regarding whether she was, at the time

she signed the 19 Lake Drive Agreement, "entitled" to a sales commission

demonstrates either her confusion regarding her understanding of her transactions with

Heritage or is a by-product of the confused course of conduct between the parties.

*Testimony of Newman*, AP-ECF No. 102, 01:53:20 – 01:55:00.  Though Newman made

a false representation by stating she was "entitled" to a commission before the property

closed, the court construes exceptions to discharge "narrowly," and further concludes

Heritage failed to establish, by a preponderance of the evidence, that Newman acted

with the requisite intent to establish a debt was incurred by "false pretenses, a false

representation, or actual fraud" and is non-dischargeable under § 523(a)(2)(A).  *Grogan*,

498 U.S. at 287; *Wang*, 548 B.R. at 401; *Marcella*, 463 B.R. at 219.

For substantially the same reasons discussed previously, Heritage failed to

demonstrate by any evidence whatsoever, that Newman acted with the "felonious

intent" to "wrongfully" take Heritage's property to satisfy § 523(a)(4), or that Newman

acted willfully or maliciously to satisfy § 523(a)(6).  *Moore,* 160 U.S. at 270; *Nofer,* 514

B.R. at 357; *Marcella*, 463 B.R. at 222.

### G.  6 Helena Drive

Heritage did not seek relief for any debt arising out the sale of 6 Helena Drive,

Cromwell, Connecticut.  However, the court finds that the evidence submitted with

respect to this transaction impacts the balance of payments between Newman and

Heritage.  As previously noted, the evidence supports a conclusion that Newman

received a total of $7,008.00 from Heritage; $5,008.00 for Newman's commission for 11

Lake Drive, and $2,000.00 for Newman's commission for 12 Clubhouse Drive.  As

discussed above, the court concludes Heritage did not establish, by a preponderance of

the evidence, that those debts were incurred by "false pretenses, a false representation,

or actual fraud," "larceny" or "willful and malicious injury."  §§ 523(a)(2)(A), 523(a)(4),

523(a)(6).

But, even assuming that the evidence satisfied by a preponderance of the

evidence that the $7,008.00 debt is non-dischargeable under §§ 523(a)(2)(A), 523(a)(4)

or 523(a)(6), it was uncontested that Newman's commission of $12,105.00 for the sale

of 6 Helena Drive was paid to Heritage.  Newman's commission of $12,105.00 for the

sale of 6 Helena Drive arguably could have satisfied and repaid her obligations under

the 11 Lake Drive Agreement and the 12 Clubhouse Drive Agreements.  *Testimony of*

*Newman*, AP-ECF No. 102, 00:53:00 – 00:53:55.[23]  Moore himself acknowledged that

Newman's commission for 6 Helena Drive was received by Heritage and was applied to

"address some arrearages."[24]  *Testimony of Moore*, AP-ECF No. 101, 00:45:50 –

00:46:10.

### H.  Newman's Counterclaim - CUTPA

Newman's answer asserted a counterclaim against Heritage, which

characterized the transactions between the parties as consumer loans by an

unauthorized lender.  AP-ECF Nos. 28, 112; *see*, Conn. Gen. Stat. § 36a-556.

Because the loans would violate Connecticut's Banking Law, Conn. Gen. Stat. 36a-

556, Newman asserted the financial transactions amount to unfair and deceptive

business practices, and seeks relief pursuant to CUTPA.  AP-ECF Nos. 28, 112.

Newman must prove a CUTPA violation by a preponderance of the evidence.  *Artie's*

*Auto Body*, 287 Conn. at 219.

Newman's counterclaim alleging violations of CUTPA fails for the same reasons

Heritage's claim of non-dischargeability failed.  Newman has not met her burden of

proof to establish an unfair business practice occurred.  "A claim under CUTPA must be

pleaded with particularity to allow evaluation of the legal theory upon which the claim is

---

[23]   The court notes the parties engaged in fourteen transactions during the course of their business
relationship.  *Testimony of Newman*, AP-ECF No. 102, 01:37:30 – 01:37:40.  The evidence in the record
referenced only seven of those transactions and based on the lack of evidence as to a comprehensive
record of the parties' dealings with one another, the court declines to determine whether Newman's
$12,105.00 payment constituted an overpayment of her obligations to Heritage.

[24]   Moore's testimony on the application of funds was at best unsupported and at worst contradictory.
While Moore admitted Newman's commission for 6 Helena was used to "address some arrearages," he
testified those funds should not have applied to Newman's debts from advances on her commissions for
11 Lake Drive, 1053 Middle Turnpike, 213 Alling Street, 37 Sunridge Lane, 12 Clubhouse Drive, or 19
Lake Drive.  *Testimony of Moore*, AP-ECF No. 101, 00:49:00 – 00:51:30.

based." *SMS Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan & King*, 32 Conn.

App. 786, 797 (Conn. App. Ct. 1993) (*citing Sorisio v. Lenox, Inc.*, 701 F.Supp. 950, 962

(D.Conn.), *aff'd*, 863 F.2d 195 (2d Cir. 1988)).  As previously stated, because the

documents, including the Sale and Assignment Agreements, were not representative of

the parties' actual course of dealing, there is a lack of evidence regarding what actually

occurred between the parties.  That Newman did not introduce a complete accounting

of her payments to Heritage renders the court unable to determine what practices were

unfair or deceptive.  Underscoring that point, Conn. Gen. Stat. § 42-110b(g) permits

only those "who suffer[] an ascertainable loss," to bring an action for damages pursuant

to CUTPA.  Here, Newman has not demonstrated, by a preponderance of the evidence,

that she has suffered damages or if so, the nature of such damages resulting from

Heritage's alleged unfair or deceptive acts.  Accordingly, the court denies Newman's

counterclaim pursuant to CUTPA.

### VII. Conclusion

While there is no doubt the parties here engaged in financial transactions prior to

the Petition Date, and there is also no doubt that each party feels cheated by the other,

the evidence presented at trial was simply insufficient to determine whether there

remained a debt from one to the other, and if so, from whom to who, and how much.

Accordingly, the court declines to conclude that any debt exists, declines to determine

that any debt (if it did exist) is non-dischargeable, and declines to find that any violation

of CUTPA occurred.

This is a final order subject to traditional rights of appeal.  A separate judgment will enter as to all counts in favor of the defendant, Nancy Newman.  The Clerk is directed to close the adversary proceeding after the entry of the judgment.

Dated this 3rd day of August, 2018, at New Haven, Connecticut.

*Ann M. Nevins*
*United States Bankruptcy Judge*
*District of Connecticut*